**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CASE NO. 1:25-CR-32-HAB-ALT |
| PAIGE NICOLE HEAGY | |

**OPINION AND ORDER**

Defendant Paige Nicole Heagy ("Heagy") pleaded guilty to making a false statement to a licensed firearm dealer in violation of 18 U.S.C. § 922(a)(6). This stemmed from her 2025 straw purchase of a pistol on behalf of Bryan Stephens ("Stephens").

The United States Probation Office ("Probation") prepared a presentence investigation report ("PSR") ahead of Heagy's sentencing. The PSR calculated Heagy's total offense level to be 13. (ECF 37, ¶¶ 20–30). To get there, Heagy received a base offense level of 14, a 2-point enhancement, and 2 reductions for accepting responsibility that subtracted 3 points total. (*Id.*). Probation applied the two-point enhancement because it concluded that Heagy "transported, transferred, sold, or otherwise disposed of, or purchased or received with intent to transport, transfer, sell, or otherwise dispose of, a firearm or any ammunition knowing or having reason to believe that such conduct would result in the receipt of the firearm or ammunition by an individual who . . . was a prohibited person." U.S.S.G. § 2K2.1(b)(6)(B)(i).

Heagy now objects to the application of the two-point enhancement under U.S.S.G. § 2K2.1(b)(6)(B)(i). (ECF 40). She argues the enhancement cannot apply because the government

cannot sufficiently show that she knew or had reason to know that Stephens was a prohibited person. The objection was fully briefed. (ECF 58, 64, 65).

Shortly after briefing concluded, the Supreme Court issued its ruling in *United States v. Hemani*, 608 U.S. __ (2026). Because *Hemani* made it less clear whether Stephens' substance use would make him a prohibited person, the Court requested supplemental briefing. (ECF 66). Those briefs have now been filed, making this objection ripe for ruling. (ECF 67, 68).

Because the government has shown by a preponderance of the evidence that Heagy had reason to believe Stephens was a prohibited person, her objection will be OVERRULED.

## BACKGROUND

ATF agents interviewed Heagy on March 26, 2025, and gathered the following facts:[1] Stephens was the husband of Heagy's best friend Jaycee. (ECF 62, ¶ 13). At this point, Jaycee was in rehab. (*Id.*). Heagy did not know Stephens very well personally, although they had engaged in sexual intercourse twice. (Intvw., at 32:40–32:50). On June 22, 2024, Stephens approached Heagy and asked if she could buy a gun for him. (ECF 62, ¶ 16). She did not ask why he could not get the gun himself. (Intvw., at 19:40–19:55). But Heagy trusted Stephens because he was Jaycee's husband and agreed to help him. (Intvw., at 17:50–18:00, 30:50–31:00). He later clarified that he wanted to get the gun for his brother. (Intvw., at 31:00–31:10).

The pair then visited four pawn shops: one in Huntington followed by three in Fort Wayne. (ECF 62, ¶ 17). Each time, they parked outside and Stephens walked in first. (Intvw., at 18:35–18:40). At the fourth shop they visited, Cash America Pawn in Fort Wayne, Stephens identified the gun he wanted. (*Id.*, at 18:40–19:15). Stephens then returned to the car, told Heagy which gun

[1] The government manually filed an audio recording of this interview with the Court (ECF 59), which the Court cites as "Intvw." with timestamps.

to get, and gave her the exact amount of cash needed to complete the purchase. (*Id.*, at 19:00–19:15). To help Heagy calm her nerves before making the purchase, Stephens gave her a Percocet pill that he obtained without a prescription. (ECF 62, ¶ 19). Stephens also took Percocet pills himself during this trip before and after Heagy went in to make the purchase. (Intvw., at 29:51–30:02, 31:06–32:20).

Heagy then went inside to buy the gun. She told the ATF that at this point, she was wondering why they were going through all these steps to get him a gun. (*Id.*, at 32:20–32:40). To complete the transaction, Heagy filled out ATF Form 4473. (ECF 62, ¶ 11). Firearms dealers use that form to perform background checks on potential gun buyers. The form includes several questions about the buyer's background and intentions for the weapon. One of them asks whether the person buying the gun is the actual buyer, and notes that the dealer cannot sell to someone buying a gun on behalf of someone else. (*Id.*). Heagy falsely answered that she was the actual buyer. (*Id.*).

Heagy passed the background check and completed the purchase. (ECF 62, ¶ 17). Once she bought the gun, she left the shop and returned to the car. (*Id.*). Heagy then gave the gun to Stephens. (*Id.*). She never possessed the gun after that. (*Id.*). Months later, Stephens attempted suicide by shooting himself with the same gun. (ECF 62, ¶ 12). When questioned by law enforcement, Stephens' wife stated that Heagy purchased the gun for him. (*Id.* ¶ 13).

After the ATF interviewed Heagy and obtained the preceding facts, the government charged her with making a false statement to a licensed firearm dealer in violation of 18 U.S.C. § 922(a)(6). (ECF 1). She later pleaded guilty. (ECF 28, 34).

When Probation prepared the PSR for Heagy's sentencing, it included a two-point enhancement under U.S.S.G. § 2K2.1(b)(6)(B). (ECF 37, ¶ 32). Probation applied the

enhancement because Stephens was a felon and an unlawful user of controlled substances. (ECF 44). Heagy objected, but Probation resolved the objection in the government's favor in an addendum to the Final PSR. (ECF 40, 44).

**DISCUSSION**

Heagy argues that the two-point enhancement under U.S.S.G. § 2K2.1(b)(6)(B) should not apply. She asserts the government cannot show by a preponderance of the evidence that she either knew or had reason to believe Stephens was a prohibited person. The Court disagrees.

The enhancement applies to defendants who "purchased or received with intent to transport, transfer, sell, or otherwise dispose of, a firearm or any ammunition knowing or having reason to believe that such conduct would result in the receipt of the firearm or ammunition by an individual who . . . was a prohibited person." U.S.S.G. § 2K2.1(b)(6)(B). A prohibited person is any person defined in 18 U.S.C. §§ 922(g) or (n). U.S.S.G. § 2K2.1(b)(6)(B) cmt. n.3. Because of the "reason to believe" language in the Guidelines, the recipient of the firearm "need not actually be a prohibited person" for the enhancement to apply. *United States v. Prieto*, 85 F.4th 445, 449 (7th Cir. 2023).

Courts have interpreted the phrase "reason to believe" to equate to different standards, but none have said it requires more than "the traditional probable-cause standard." *United States v. McKenzie*, 33 F.4th 343, 348 (6th Cir. 2022). This means, at most, the government must show that Heagy knew of facts that "create a 'fair probability' that the buyer is a prohibited person." *Id.*

No evidence shows that Heagy knew Stephens was a felon.[2] Evidence of Stephens' drug use, while potentially enough to make him a prohibited person, is thin. All the Court can reliably garner from the ATF's interview with Heagy is Stephens' consumption of the Percocet pill on the

---

[2] In fact, as Heagy points out, the government has introduced no evidence of any felony conviction Stephens has.

day of the purchase and her rough recollection of his additional drug consumption at other points. Given the recent Supreme Court ruling in *Hemani*, the Court cannot say with certainty that Stephens would be a prohibited person based on his drug use. But the government only needs to show that Heagy had reason to believe Stephens was a prohibited person. They need not prove Stephens actually was prohibited to prove the enhancement.

Here, Heagy had reason to believe Stephens was a prohibited person based on his behavior the day of the purchase. Stephens never said he could not buy the gun himself. But he asked Heagy to buy it for him and proceeded to coordinate every aspect of the purchase so Heagy could make it on his behalf. Heagy watched Stephens go inside several stores so he could search for the gun he wanted. When he found what he wanted, he gave her the exact amount in cash and had her go buy the gun for him.

Heagy insists she never asked Stephens why he could not buy the gun himself. Perhaps she did not. Even so, combine his unusual ask with his elaborate trip to different stores, which Heagy herself observed, and the government has enough to meet its burden. Stephens had the wherewithal to visit several shops that sell guns and investigate whether they had the gun he wanted. If he could go to the store and find the gun he wanted, why would he not just buy it himself? Even if the circumstances did not actually lead Heagy to ask this question, she had ample cause to do so. Further, she admitted to ATF agents that she at least pondered this when she went into the pawn shop to buy the gun.

The Sixth Circuit's decision in *McKenzie*, while not binding here, is cited extensively by both parties and persuades this Court to its conclusion. That case featured a defendant convicted

of the same offense and subjected to a guideline with similar language. 33 F.4th at 347.[3] There, the defendant made straw purchases for two separate buyers. *Id.* at 345–47. The defendant did not know either particularly well, nor did he ask either why they could not buy the gun themselves. *Id.* But both buyers said things or acted in ways that should have raised his suspicions. *Id.* So, considering "common-sense" factors that other courts relied on for establishing probable cause, the *McKenzie* court upheld the enhancement. *Id.* at 351–52. Those factors include "red flag" statements, price markups, or other facts that highlight a person's prohibited status. *Id.* at 349.

Heagy argues that none of the "common-sense" factors identified in *McKenzie* and other cases apply here, so the government has not met its burden. The Court agrees that this case features fewer obvious factors than *McKenzie* and other cases that it cited.[4] She did not, for example, receive extra money to make the purchase, buy multiple guns, or get told anything explicitly stating Stephens was a prohibited person. But the enhancement still applies.

As *McKenzie* acknowledged, "suspicious facts can create a sufficient reason to believe that the true buyer cannot lawfully possess a firearm even if those facts might have an 'innocent explanation.'" *Id.* at 351–52. Asking a mere acquaintance to buy a gun is an odd request. *McKenzie* recognized as much. *Id.* at 350. In fact, *McKenzie* noted that such a request alone "likely create[s] a 'substantial chance' that [the buyer] could not lawfully possess firearms." *Id.* But even if that were not enough, Heagy observed more suspicious behavior. Stephens went to several stores

---

[3] That guideline, established in U.S.S.G. § 2K2.1(a)(4)(B), sets a base offense level of 20 for convictions that feature three elements. One of those is that the defendant "committed the offense with knowledge, intent, or reason to believe that the offense would result in the transfer of a firearm or ammunition to a prohibited person[.]" U.S.S.G. § 2K2.1(a)(4)(B).

[4] *See,e.g.*, *United States v. Pawlak*, 822 F.3d 902, 912 (6th Cir. 2016), *abrogated on other grounds by Beckles v. United States*, 580 U.S. 256 (2017) (parties met in secret, buyer agreed to pay substantial mark-up for market price of the firearm, and buyer told seller he would leave the truck running "in case something went wrong"); *United States v. Juarez*, 626 F.3d 246, 256 (5th Cir. 2010) (straw purchaser bought 25 firearms for the same person over 13 months); *United States v. Freeman*, 640 F.3d 180, 189 (6th Cir. 2011) (straw purchaser gave the firearm to someone he knew was a heroin dealer).

looking for the gun he wanted, found it, and then still sent Heagy in to buy it for him. If the request alone did not raise alarm bells for Heagy, this should have. And from her telling, she in fact was perplexed at this point.

The Court cannot say for sure that Heagy buried her head in the sand to give herself plausible deniability. Nor can it confidently say Heagy knew Stephens was a prohibited person. But based on how Stephens interacted with her on June 22, 2024, the Court finds that Heagy had reason to believe he was a prohibited person. Thus, enhancement under U.S.S.G. §2K2.1(b)(6)(B) properly applies here.[5]

Heagy alternatively argues that if the enhancement applies, the Court should also apply a two-level reduction under U.S.S.G. §2K2.1(b)(10). Because Heagy is receiving a U.S.S.G. §2K2.1(b)(6) enhancement and has 1 criminal history point or less, she is entitled to that downward departure if she "(i) was motivated by an intimate or familial relationship or by threats or fear to commit the offense and was otherwise unlikely to commit such an offense; or (ii) was unusually vulnerable to being persuaded or induced to commit the offense due to a physical or mental condition." *Id.*

Heagy argues that this reduction applies because she and Stephens had a sexual relationship, Stephens took advantage of her trust because he was married to her best friend, and he provided her with laced pills to do his bidding. The government counters that mere sexual intercourse is not enough for this enhancement to apply, and that even if it was, Heagy cannot show it motivated her to purchase the firearm. The Court agrees with the government on the latter argument.

---

[5] Because the Court upholds the enhancement on this basis, it need not address the parties' arguments about actual knowledge or the "ostrich instruction."

Heagy admitted that she engaged in sexual activity with Stephens twice. This does not seem to amount to a highly intimate relationship. The government points out that 18 U.S.C. § 921(a)(32) sets a strict definition of "intimate partner" that Heagy does not meet. But "intimate relationship" could have a less restrictive meaning than "intimate partner." Further, this subsection of the Guidelines is new, and the Court cannot identify any federal cases which have addressed it. So the Court hesitates to reject the reduction based on what does or does not constitute an "intimate or familial relationship."

But even if there were an intimate relationship as envisioned by the Guidelines, Heagy cannot show she was motivated by that relationship. Heagy told the ATF from the outset that she did not know Stephens very well. She attributed her trust in Stephens to his status as Jaycee's husband, not her sexual partner. Heagy only talked to ATF agents about the brief sexual nature of their relationship for less than 2 minutes of the more than 50-minute interview. (Intvw., at 32:40–34:30). She said she stopped after the two sexual encounters because the betrayal of her best friend made her "sick to [her] stomach." (*Id.*, at 34:05–34:15). In fact, she explicitly told ATF agents that the two sexual encounters happened before she bought the gun and disclaimed that the gun was part of any related exchange. (*Id.*, at 34:15–34:30). No other evidence ties Heagy's actions to her prior intimacy with Stephens. This reduction therefore does not apply.

## **CONCLUSION**

For these reasons, Heagy's objection (ECF 40) is OVERRULED.

**SO ORDERED** on October 28, 2026.

s/ *Holly A. Brady*
CHIEF JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT